# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SARAH DOMINGUEZ,**

      **Plaintiff,**

**v.**                                         **Civ. No. 17-118 KK/SCY**

**United States of America,**

      **Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Defendant's *Motion to Dismiss Second Amended Complaint (ECF No. 17) For Lack of Subject-Matter Jurisdiction and Memorandum in Support* filed July 19, 2017.  (Doc. 21.)  Plaintiff filed a Response on July 19, 2017.  (Doc. 24.) Defendant filed a Reply on August 9, 2017.  (Doc. 30.)  Additionally, pursuant to this Court's order (Doc. 38), supplemental briefing was submitted by both parties.  (Doc. 44; Doc. 47; Doc. 49.)

Plaintiff Sarah Dominguez, a civilian, was injured while participating in an activity at the Para-Rescue Academy at the Kirtland U.S. Air Force Base.  (Doc. 17 ¶¶ 11, 14.)  Defendant, the United States of America, operates the Air Force base.  (Doc. 17 ¶ 6.)  Plaintiff filed this lawsuit seeking damages under the Federal Tort Claims Act based on the theory that Defendant is liable for her injuries which, she alleges, were caused by the negligence of Defendant's employees. (Doc. 17.)  In the *Motion* presently before the Court, Defendant seeks dismissal of Plaintiff's claims for lack of subject matter jurisdiction pursuant to Federal Rule of Procedure 12(b)(1). (Doc. 21.)  The Court, having considered the parties' submissions, the record, and the relevant law concludes that the *Motion* is not well taken, and shall be denied.

    **I.**        <u>**The Law Governing Rule 12(b)(1) Motions**</u>

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may come in one of two forms—a "facial attack" or a "factual attack." *Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995). A facial attack, which challenges the sufficiency of the allegations in the complaint, relates to the plaintiff's obligation, under Federal Rule of Civil Procedure 8(a)(1), to demonstrate that the court has jurisdiction over the subject matter of the case. *Holt*, 46 F.3d at 1002; 5B Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1350 (3d ed. 1998). "In reviewing a facial attack, a district court must accept the allegations in the complaint as true." *Holt*, 46 F.3d at 1002. A factual attack, on the other hand, "challenges the facts upon which subject matter jurisdiction depends." *Holt*, 46 F.3d at 1003. When reviewing a factual attack on subject matter jurisdiction, the truthfulness of the complaint's factual allegations is not presumed, and the court may, without converting the motion to a Rule 56 motion for summary judgment, consider affidavits and other documents to resolve disputed jurisdictional facts. *Id.* In either circumstance, "it is well-settled that the complaint will be construed broadly and liberally." Wright & Miller, *supra*.

## II.     The Relevant Law Governing Subject Matter Jurisdiction

The United States, as a sovereign, is immune from suit except under circumstances in which it has unequivocally expressed its consent to be sued. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). "A waiver of sovereign immunity cannot be implied but must be unequivocally expressed." *Id.* As such, "[i]n the absence of clear congressional consent" the court has no jurisdiction to entertain a lawsuit against the United States. *Id.* "It is to presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the" plaintiff. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citation omitted).

In 28 U.S.C. Section 1346(b)(1), Congress granted district courts original jurisdiction over

> civil actions on claims against the United States, for money damages . . . for . . . personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, *under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.*

(Emphasis added).  The crux of the issue raised by Defendant's *Motion* pertains to the language of Section 1346(b)(1) that the Court has italicized.

Stated summarily, the Court is called upon to determine whether, applying New Mexico law to the circumstances of this case, a private entity would be liable for the negligently caused injuries alleged by Plaintiff.  (Doc. 21 at 6; Doc. 24 at 4.)  Defendant's *Motion* is premised on a theory that Plaintiff's claims, if brought against a private entity in New Mexico, would be barred by the enforcement of a signed waiver of liability; and, as such, the facts of this case preclude this Court's subject matter jurisdiction under 28 U.S.C. Section 1346(b)(1).  Defendant's *Motion* constitutes a factual attack upon Plaintiff's *Complaint*.  Accordingly, the information presented in the "background" section that follows derives from the allegations in Plaintiff's *Complaint*, and from documents and affidavits attached to the parties' respective papers.  *Holt*, 46 F.3d at 1003 (stating that the Court is permitted to consider affidavits and other documents in considering a factual attack on its subject matter jurisdiction).

## III.    <u>BACKGROUND</u>

On the day that she was injured, Plaintiff and a group of her coworkers from Sandia National Laboratories went to the Para-Rescue Academy (the Academy) to participate in team building exercises.  (Doc. 17 ¶ 11; Doc. 21-1 ¶¶ 1-2.)  One such exercise involved rappelling down an

outdoor wall or "tower."[1]   (Doc. 17 ¶ 11; Doc. 21 ¶ 3; Doc. 24 at 5.)   According to Plaintiff, climbing "was not to be part of the day's activities."  (Doc. 24-2 ¶ 10.)

According to United States Air Force Staff Sergeant Jared Stidham, an instructor at the outdoor rappelling tower, "[t]he tower is not open to the general public[,]" and "[b]efore a group can use the tower, the Air Force undergoes a Risk Management process to weigh risk factors and any mitigation, and it is approved by the 351 BATS commander." (Doc. 21-1 ¶¶ 1, 8.)  Plaintiff avers that she "did not participate in any so-called risk management process prior to participating in the team building activities, neither through . . . work with Sandia National Laboratories nor through the United States Air Force."  (Doc. 24-1 ¶ 2.)

Before the climbing activity began, Sergeant Stidham gathered Plaintiff and her coworkers at the base of the tower and handed each of them a waiver of liability.  (Doc. 21-1 ¶ 3.)  As he distributed the waivers, Sergeant Stidham explained that the waiver "was a document relieving the Air Force from responsibility for injuries and that the participants had to understand they were taking a risk by rappelling."  (Doc. 21-1 ¶ 4.)  According to Sergeant Stidham, the participants "had plenty of time to read the form" and no one had any questions related thereto. (Doc. 21-1 ¶ 4.)  According to Plaintiff, there was "no discussion as to specific risks of rappelling, such as falling, the safety line possibly defaulting or not working"; and she does "not recall potential risks in general being listed or discussed."  (Doc. 24-1 ¶ 9.)  The participants were not given the option of purchasing "special protections" such as insurance against negligence. (Doc. 24-1 ¶ 8.)  Plaintiff signed the waiver.  (Doc. 21-2; Doc. 21-1 ¶ 6.)

Plaintiff informed Sergeant Stidham that she had no rappelling experience, and "no one" (it is unclear who, other than Sergeant Stidham, was instructing or leading the activity) assessed her

---

[1] The parties variously refer to the object that Plaintiff climbed as a "wall" and as a "tower."  (See e.g. Doc. 24 ¶¶ 2, 6; Doc. 21 ¶¶ 3, 8-10.)  Accordingly, the Court infers that no distinction is implied by the different terms.

skill level before allowing her to engage in the exercise. (Doc. 17 ¶¶ 18, 22; Doc. 24-1 ¶ 6.) Sergeant Stidham gave the participants some training (the extent of which is not clear). (Doc. 21-1 ¶ 8; Doc. 17 ¶¶ 11-12, 18, 22.) Sergeant Stidham averred that he does not allow a participant to rappel without taking his training and demonstrating, while still anchored to the tower, that he or she knows how to use the rappelling device. (Doc. 21-1 ¶ 8.)

Sergeant Stidham provided Plaintiff with his personal rappelling equipment—including a harness and gloves, and Plaintiff and one of her co-workers were the first to rappel. (Doc. 17 ¶ 11; Doc. 24-1 ¶ 12.) They tested their levers by putting weight on the rope, and received instructions related to using the lever as a stopping mechanism. (Doc. 17 ¶ 11.) Rappelling requires a participant to walk up several flights of stairs to the top of the tower, and if the participant decides not to rappel, she may take the stairs back to the ground. (Doc. 21-1 ¶ 7.)

Plaintiff reached the top of the wall to begin the exercise, and "[t]he next thing [she] remembers is lying in a bed at the Sandia Clinic." (Doc. 17 ¶ 11.) After she fell, Plaintiff was physically moved instead of immobilized, and Defendant's staff did not contact emergency personnel. (Doc. 17 ¶ 13.) Instead, after Sergeant Stidham "assessed" her, Plaintiff's coworker took her to Sandia Clinic from where she was taken to the hospital in an ambulance. (Doc. 24-1 ¶ 13.) This lawsuit ensued.

Plaintiff's *Second Amended Complaint for Damages Under the Federal Tort Claims Act* (Doc. 17) is comprised of two counts. In Count I "Negligence," Plaintiff claims that Defendant failed to exercise ordinary care in regard to several aspects of the rappelling—including, among other things, ensuring that the staff at the Academy possessed the adequate skill and competency to lead the exercise, and ensure the safety and efficacy of the rappelling equipment provided to Plaintiff by the Academy. (Doc. 17 ¶¶ 15-26.) She also claims that, after she fell, the Academy

staff was negligent insofar as they (1) physically moved her or allowed her to be moved instead of immobilizing her, and (2) failed to contact emergency medical personnel. (Doc. 17 ¶¶ 13, 19.) Thus, although they are presented as a single claim, the Court construes the *Complaint* as alleging two circumstances of negligent conduct—one related to the cause of her fall, and one related to the manner in which she was treated after she had fallen. In Count II "Vicarious Liability, Respondeat Superior, Ostensible Agency and/or Agency," Plaintiff claims that Defendant is liable for her injuries under the Federal Tort Claims Act, 28 U.S.C. Section 2671 and 28 U.S.C. Section 1346(b)(1). (Doc. 17 ¶¶ 1-2, 27-33.)

Defendant contends that the waiver Plaintiff signed before engaging in the rappelling activity is a valid and enforceable agreement under New Mexico law which effectively bars Plaintiff's claims, and by extension, precludes this Court's subject matter jurisdiction under 28 U.S.C. Section 1346(b)(1). (Doc. 21 at 4-11.) Plaintiff argues that the waiver is unenforceable as a matter of New Mexico law. (Doc. 24 at 4-11.) While the Court rejects the notion advanced by Plaintiff that the language of the waiver, insofar as it uses the term "climbing" instead of the term "rappelling" did not apply to the activity that led to her injury, the Court otherwise concludes that the waiver is, as Plaintiff argues, unenforceable owing to its vagueness and public policy implications.

IV.   <u>Discussion</u>

A. <u>The Waiver</u>

To provide context for the ensuing analysis, the language of the waiver in its entirety, excepting the signature lines, follows.

**USAF Pararescue/Combat Rescue Officer Climbing Tower**
**WAIVER OF LIABILITY AND HOLD HARMLESS AGREEMENT**

1. In consideration for receiving permission to participate in climbing activities on the USAF Pararescue/Combat Rescue Officer School climbing tower, I hereby release, waive, discharge and covenant not to sue the United States Air Force Pararescue/Combat Rescue Officer School, its officers, and employees (hereinafter referred to as 'releasees') from any and all liability, claims, demands, actions and causes of action whatsoever arising out of or relating to any loss, damage or injury, including death, that may be sustained by me, or to any property belonging to me, whether caused by the negligence of the releasees, or otherwise, while participating in the climbing (hereinafter referred to as 'the event'), or while in, or upon the premises where the event is being conducted, while in transit to or from the premises, or in any place or places connected with the event.

2. I am fully aware of risks and hazards connected with being on the premises and participating in the event, and I am fully aware that there may be risks and hazards unknown to me connected with being on the premises and participating in the event, and I hereby elect to voluntarily participate in the event, to enter upon the above named premises and engage in activities knowing that conditions may be hazardous, or may become hazardous or dangerous to me and my property. I voluntarily assume full responsibility for any risks of loss, property damage or personal injury, including death, that may be sustained by me, or any loss or damage to property owned by me, as a result of my being a participant in the Event, whether caused by the negligence of releasees or otherwise.

3. I further hereby agree to indemnify and save and hold harmless the releasees and each of them, from any loss, liability, damage or costs they may incur due to my participation in the event, whether caused by the negligence of any or all of the releasees, or otherwise.

4. It is my express intent that this Release shall bind the members of my family and spouse, if I am alive, or deceased, and my heirs, assigns and personal representative, if I am deceased, and shall be deemed as a Release, Waiver, Discharge and Covenant Not to Sue the above named releasees.

In signing this release, I acknowledge and represent that:

A. I have read the foregoing release, understand it, and sign it voluntarily as my own free act and deed;

B. No oral representation, statements or inducements, apart from the foregoing written agreement have been made;

C. I am at least eighteen (18) years of age and fully competent; and

D. I execute this Release for full, adequate and complete consideration fully intending to be bound by same.

(Doc. 21-2.)

**B. The *Berlangieri* Case**

Although the parties disagree on the question whether the waiver bars Plaintiff's negligence claims, they agree that analysis of this question under New Mexico law is primarily informed by *Berlangieri v. Running Elk Corporation*, 76 P.3d 1098 (N.M. 2003), the leading New Mexico case on the issue of the validity and enforceability of liability releases for recreational activities. The *Berlangieri* court considered the validity and enforceability of a liability release that was provided by a resort facility to guests who participated in various recreational activities, including horseback riding. *Id.* at 1100-01. The plaintiff, who was a guest at the facility, signed the release so that he could participate in a guided horseback trail ride. *Id.* at 1101.

The plaintiff was a novice rider, so a gentle easygoing horse was selected for him, and the defendant's staff informed him that "horseback riding entailed certain unavoidable risks of injury due to the unpredictable nature of horses." *Id.* at 1101. The plaintiff was injured when, as an apparent result of the saddle sliding to the side—either because it had been improperly positioned or as a consequence of equipment failure, he fell off the horse as it was running. *Id.* at 1102.

The plaintiff sued the facility for injuries that he sustained during the horseback trail ride, alleging negligence and other theories of liability. *Id.* at 1102. When the facility prevailed on a summary judgment motion based on a theory that the release exculpated it from a negligence claim, the plaintiff appealed—arguing that the release was unenforceable as a matter of public policy. *Id.*

By the time the case reached the New Mexico Supreme Court, two issues were outstanding. One issue was the extent to which New Mexico's Equine Liability Act, which governs liability for personal injuries and death caused by "the behavior of equine animals while engaged in any equine activities," affected the public policy analysis. *Berlangieri*, 76 P.3d at 1103, 1110. The other was whether, and if so under what circumstances, liability releases for personal injury may be enforced under New Mexico law. *Id.* at 1103, 1107. The *Berlangieri* court's discussion of the latter issue informs the Court's analysis here.

The *Berlangieri* court recognized New Mexico's "strong public policy of freedom to contract" which requires courts to enforce contracts "unless they clearly contravene some law or rule of public morals." *Id.* at 1105 ("Great damage is done where businesses cannot count on certainty in their legal relationships and strong reasons must support a court when it interferes in a legal relationship voluntarily assumed by the parties."). However, recognizing the important public policies that are furthered by negligence law—*e.g.*, distribution of the economic burden of loss from the injured party to the tortfeasor, deterrence of unreasonable or immoral conduct, and allowing injured victims compensation and satisfaction for wrongs committed against them, the court recognized the need for "strict limits on the use of exculpatory agreements[.]" *Id.* at 1105-06. Accordingly, the court held that "liability releases for personal injury may be enforced in [those] limited circumstances" in which the release (1) survives a strict construction analysis and, (2) does not contravene public policy. *Id.* at 1107, 1109. The strict construction and public policy principles established in *Berlangieri* are discussed in greater detail, as they relate to the facts of this case, in the ensuing analysis.

**C.  Analysis**

**1.  Strict Construction**

Pursuant to *Berlangieri*, courts endeavoring to strictly construe a recreational release must consider whether the language of the release is "sufficiently clear and unambiguous that it would inform the person signing it of its meaning." *Id.* at 1107. It should be "written in simple and clear terms . . . free from legal jargon" and, while it must clearly and unambiguously express the intent of the parties to extinguish liability, it should not be inordinately long or complicated. *Id.* at 1108. Ambiguities are construed against the drafter; however, the "reality [is] that the very same words can mean different things to different people, [therefore] context is important." *Id.* at 1107-08. Accordingly, in construing the language of a release, courts should consider "the words surrounding the portion [of the release] being construed and the circumstances surrounding the agreement[.]" *Id.* at 1108. Further, "[i]t is important that the release . . . contain specific language informing the patron of the types of risks being assumed[.]" *Id.*

Plaintiff seeks to circumvent the waiver by relying on a strict construction of the term "climbing" as distinct from the term "rappelling." (Doc. 24 at 5-7.) Specifically, Plaintiff argues that the waiver does not bar her claim because she was injured while "rappelling" which activity, she claims, was not covered by the release, which applied only to "climbing." (Id.) In support of this argument, Plaintiff compares the Dictionary.com definitions of "climb" (meaning to ascend) and "rappel" (a "mountaineering" term that means "the act or method of moving down a steep incline or past an overhang by means of a double rope secured above and placed around the body, usually under the left thigh and over the right shoulder, and paid out gradually in the descent"). (Doc. 24 at 5.) Characterizing rappelling and climbing as "opposite activities," Plaintiff argues that it is "a stretch" and it would require "interpretation far outside the four corners of the" waiver to conclude that the risks and hazards of "climbing" applied to the rappelling activity in which she engaged. (Doc. 24 at 5.) Plaintiff's argument is not persuasive.

In common parlance, the term "climb" does not exclusively signify ascent. Just as one may "climb up" one may also "climb down." *See Climb*, <u>The Oxford English Dictionary</u> (2d ed. 1998) (defining "climb" as "[t]o raise oneself by grasping or climbing, or by the aid of hands and feet; to mount by means of some hold or footing; to creep up; to ascend, come, or go up, a perpendicular or steep place"; and including the phrase "to climb down" as "to descend by the same means"); *Climb*, <u>Webster's II New Riverside University Dictionary</u> (1994) (including "climb," meaning to ascend, and "climb down," meaning to descend, within the definition of "climb"). Thus the waiver, which referred variously to "*climbing activities*" on the "climbing tower" and to "participating in *the climbing*," does not reasonably imply a distinction between climbing up the climbing tower versus climbing down the climbing tower as part of the "climbing activities." Although the waiver could have been written to distinguish the act of "climbing up" the tower from the act of "rappelling" down the tower instead of referring broadly to "climbing activities," under the circumstances of this case, it is not reasonable to conclude that the absence of the terms "rappelling" or "rappel" rendered the waiver so unclear and ambiguous that Plaintiff was not informed of its meaning.

Plaintiff and her coworkers were assembled at the base of the climbing tower when the instructor provided each of them with a waiver. (Doc. 24 ¶ 6; Doc. 21-1 ¶ 3.) It would be clear to anyone who had seen the tower and was contemplating "participating in the climbing" that the "climbing activities" necessarily encompassed both the ascent and the descent. *See Berlangieri*, 76 P.3d at 1108 ("Context is important . . . the circumstances surrounding the agreement are relevant."). Plaintiff's argument to the contrary is premised on the notion that, when she signed the waiver, Plaintiff believed that she was waiving her right to sue for any injury that she suffered while climbing *up* the tower, while retaining her right to sue for any injury that she

suffered going *down* the tower simply because the term "rappelling" did not appear in the waiver. For the reasons already stated, the Court declines to accept this premise.

Although the Court is not persuaded by Plaintiff's argument pertaining to the strict construction of the term "climbing," the waiver is, in other respects, so unclear and ambiguous, that it does not "inform the person signing it of its meaning." *See Berlangieri* at 1107 (explaining that a strict construction analysis requires the specific language of the release to be "sufficiently clear and unambiguous that it would inform the person signing it of its meaning"). As noted above, the *Berlangieri* court held that it is important that a release "contain specific language informing the patron of the types of risks being assumed[.]" *Id.* at 1108. In support of this proposition, the *Berlangieri* court cited *Day v. Snowmass Stables, Inc.*, 810 F. Supp. 289, 294-95 (D. Colo. 1993), for the proposition that a release that does "not explain the specific risks being assumed by the person who signed it" may be held invalid. *Berlangieri*, 76 P.3d at 1108.

In *Day*, the plaintiff was injured during a horse-drawn-wagon ride—a recreational activity for which she had signed a release exculpating Snowmass Stables, Inc., whose business included providing wagon rides to the public, from "any liability for claims or lawsuits . . . arising out of the activities provided by the concessioner." *Day*, 810 F. Supp. at 291, 294. The plaintiff was injured when she was thrown from a wagon, which was the culminating event in a series set in motion by a broken neck yoke ring on a wagon that was travelling behind the one in which the plaintiff was riding. *Id.* at 291. The release that the plaintiff had signed read, in part, that: "the concessioner and the concessioner's employees [are released] from any liability for claims or lawsuits . . . arising out of the activities provided by the concessioner." *Id.* at 294. And, the *Day* court concluded, the plaintiff's claim clearly "arose out of her participation in the stable's activities." *Id.* at 294-95. However, relying on the principle that "when the parties adopt broad

language in a release, it is reasonable to interpret the intended coverage to be as broad as the risks that are *obvious to experienced participants*[,]" the *Day* court held that in the absence of any evidence that the plaintiff had experience with horse-drawn wagons, and considering the non-obviousness of the risk of injury resulting from the failure of a neck yoke ring, the court concluded that the release did not shield the stables from liability for the plaintiff's injuries. *Id.* at 295. In support of this holding, the *Day* court contrasted the language of the at-issue release with the language of a recreational release that was held to be valid and enforceable in *Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781 (Colo. 1989). *Day*, 810 F. Supp. at 295.

In *Heil Valley Ranch*, the plaintiff, an experienced horseback rider signed a "Release of Liability" before participating in a horseback ride—a recreational activity provided by the defendant ranch. *Id.* at 782-83, 785. The release provided, in relevant part, that:

> UPON MY ACCEPTANCE OF HORSE AND EQUIPMENT, I ACKNOWLEDGE THAT THE USE, HANDLING AND RIDING OF A HORSE INVOLVES A RISK OF PHYSICAL INJURY TO ANY INDIVIDUAL UNDERTAKING SUCH ACTIVITIES; AND THAT A HORSE, IRRESPECTIVE OF ITS TRAINING AND USUAL PAST BEHAVIOR AND CHARACTERISTICS, MAY ACT OR REACT UNPREDICTABLY AT TIMES BASED UPON INSTINCT OR FRIGHT WHICH, LIKEWISE, IS AN INHERENT RISK ASSUMED BY A HORSEBACK RIDER. THE UNDERSIGNED EXPRESSLY ASSUMES SUCH RISK AND WAIVES ANY CLAIM HE [or] SHE MIGHT STATE AGAINST THE STABLES AS A RESULT OF PHYSICAL INJURY INCURRED IN SAID ACTIVITIES. EXCEPT TO THE EXTENT SUCH CLAIM MIGHT BE BASED UPON THE SOLE AND EXCLUSIVE NEGLIGENCE OF THE STABLES THE UNDERSIGNED FURTHER AGREES TO HOLD THE STABLES HARMLESS FOR PHYSICAL INJURY TO OTHERS, OR FOR PROPERTY DAMAGE, WHICH RESULTS FROM RIDERS USE OF STABLES HORSE IN VIOLATION OF ANY STABLES' RULES OR THE TERMS AND CONDITIONS OF THIS AGREEMENT.

*Id.* at 782. The *Heil Valley Ranch* plaintiff was severely injured when the horse that she was riding reared up and fell backwards onto her. *Id.* at 783. In support of its holding that the release

stood as a valid and enforceable bar against the plaintiff's negligence and breach of warranty claims against the ranch, the court reasoned that:

> the first sentence of the release specifically addressed a risk that adequately described the circumstances of [the plaintiff's] injury. The record also supports that [the plaintiff] was not a novice rider, but was instead one with some experience. The risk that a horse could rear and injure her was reasonably foreseeable to someone with her experience.

*Id.* at 785. [2]

Insofar as the *Berlangieri* court relied on *Day* in establishing the principles by which the clarity or ambiguity of recreational releases should be analyzed in New Mexico, it is reasonable to assume that the basic principle from which the *Day* court's holding derived applies here. As such, in considering whether the waiver informed Plaintiff "of the types of risks being assumed," the Court examines the breadth of the language in the waiver and the obviousness to Plaintiff of the risks associated with climbing on the USAF Pararescue/Combat Rescue Officer School climbing tower. *Berlangieri*, 76 P.3d at 1108; *Day*, 810 F. Supp. at 295.

To that end, the Court begins by noting that the language of the waiver is exceedingly broad and appears to cover both negligent and intentional acts. It purports to release Defendant from

> any and all liability . . . arising out of or relating to any loss, damage or injury, including death, that may be sustained by me, or to any property belonging to me, whether caused by the negligence of the releasees, or otherwise, while participating in the climbing . . . or while in, or upon the premises where the event is being conducted, while in transit to or from the premises, or in any place or places connected with the event.

Further, it requires the participant to acknowledge full awareness of "risks and hazards connected with being on the premises and participating in the" climbing and to acknowledge awareness of

---

[2] The Court notes that the *Berlangieri* Court also discussed *Heil Valley Ranch*—particularly the dissenting opinion which reasoned that the release should be held unenforceable as to the plaintiff's negligence claim on the ground that the release did not purport to exempt the defendant's liability for negligence because it only described the inherent dangers of horseback riding. *Berlangieri*, 76 P.3d at 1108. The *Berlangieri* court noted this to illustrate the importance of drafting releases as carefully as possible "to convey the intent of the agreement in terms that both parties to the release can and do understand. *Id.*

"unknown" risks and hazards connected with being on the premises and participating in the climbing. Thus, while the waiver informs the participant that there are risks and hazards—both known and unknown associated with the climbing event, it is devoid of specificity as to what those risks may be. Further, unlike the defendant in *Berlangieri*, who supplemented the somewhat broad language of the release by informing its guests of "certain unavoidable risks of injury due to the unpredictable nature of horses," *Berlangieri*, 76 P.3d at 1101, Sergeant Stidham did not inform Plaintiff and her coworkers of particular risks associated with the climbing activity.

Plaintiff has alleged that she had no rappelling experience, and that she shared this information with Sergeant Stidham. She has also alleged that the underlying causes of her injury include: Defendant's failure to ensure that its staff possessed adequate skill and competency to lead the climbing exercise; its failure to ensure that the rappelling equipment provided to Plaintiff was correctly connected and not defective; and that, after she fell, the Academy staff moved her or allowed her to be moved, and failed to contact emergency medical personnel. Following the reasoning in *Heil Valley Ranch*, which informed the *Day* analysis which, in turn, informed the *Berlangieri* court's framework, the waiver did not reasonably inform Plaintiff that she was assuming such risks. To conclude otherwise would require the Court to believe that Plaintiff, who had no experience rappelling, would infer from the release that among the "acknowledged" and "unknown" risks and hazards she was assuming were: the risk that unskilled and incompetent instructors would give her inadequate training; would provide her with faulty or incorrectly attached climbing equipment; and in the event of her injury, they would fail to take reasonable precautions—such as leaving her in place and summoning emergency personnel. The Court cannot accept this unreasonable proposition. Instead, the Court concludes

that here, as in *Day*, owing to the breadth of the waiver combined with the non-obviousness of the risks, the waiver did not clearly and unambiguously inform Plaintiff of the risks being assumed. *See Berlangieri*, 76 P.3d at 1107 (stating that ambiguities are construed against the party who drafted the release).

Because the waiver did not adequately inform Plaintiff of the risks that she was assuming, it is invalid and unenforceable as a bar to Plaintiff's negligence claims. *See id.* at 1107-08 (stating that to pass a strict construction analysis, a recreational release must be "sufficiently clear and unambiguous that it would inform the person signing it of its meaning"; and "[i]t is important that the release . . . contain specific language informing the patron of the types of risks being assumed"). On this basis alone, the Court would deny Defendant's *Motion*. However, the Court continues its discussion to highlight additional problems with the enforceability of the release here.

### 2. **Public Policy**

A recreational release that passes a strict construction analysis may nevertheless be unenforceable on public policy grounds. *Berlangieri*, 76 P.3d at 1109-1113 (concluding that the language of the at-issue release was "sufficiently clear" but holding that the release should not be enforced on public policy grounds); *see also Hanks v. Powder Ridge Rest. Corp.*, 885 A.2d 734, 739-40, 747 (Conn. 2005) (holding that a liability waiver pertaining to snowtubing was sufficiently clear and unambiguous, but was unenforceable on public policy grounds). The Court's analysis of the public policy issue is guided by the non-exclusive six factors set forth by the *Supreme Court of California in Tunkl v. Regents of University of California*, 383 P.2d 441, 445-46 (Cal. 1963). *Berlangieri*, 76 P.3d at 1109. The *Tunkl* factors, which characterize an "attempted but invalid" release, are, as enumerated in *Berlangieri*, the following:

[1] [the release] concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself [or herself] out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his [or her] services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his [or her] agents.

*Berlangieri*, 76 P.3d at 1109–10. The *Tunkl* factors do not comprise a "balancing test"; and not every factor will apply to the at-issue release. *Berlangieri*, 76 P.3d at 1110. Rather, they "are only indicators . . . helpful in determining the larger question of whether enforcement of the release would be unjust." *Id.* As such, it is possible that the application of just one factor would be applicable, but it "would be significant enough to make the release unenforceable." *Id.*; *see Tunkl*, 383 P.2d at 445 (stating that an exculpatory agreement that inheres "some or all" of these qualities is invalid).

1. ___*Tunkl* factors 1, 2, and 4, as enumerated above, do not apply here.___[3]

The issue presented to the Court is the validity and enforceability of the waiver that Plaintiff signed before engaging in a recreational climbing activity. The parties do not cite, and the Court

_____

[3] Plaintiff argues that the first two *Tunkl* factors apply here because (1) the physical construction of the Academy was, and its operation as a pararescue and combat rescue training school is, subject to federal regulations and executive orders, and (2) "pararescue and combat rescue training" are "necessary for members of the public." (Doc. 24 at 9-10.) These arguments are presented without citations to authority, and are generally unpersuasive. Even assuming that the construction of the building was, and the operation of the Academy as an officer training school is, governed by regulations, the issue before the Court is whether the provision of recreational climbing services is generally suitable for public regulation. Plaintiff does not argue or present authority to support the notion that recreational climbing and rappelling satisfy this criterion. Further, the Court need not, and does not, consider the validity of the proposition that pararescue and combat rescue training is "necessary for members of the public." The waiver did not apply to, and Plaintiff did not engage in, such training. Plaintiff's argument in regard to the fourth *Tunkl* factor, that the waiver was presented as a "no-bargain, take-it or leave-it opportunity" applies to, and is considered in the Court's analysis of, the fifth *Tunkl* factor.

is not aware of, any authority for the proposition that, under New Mexico or federal law, recreational climbing or rappelling are subject to "special regulatory treatment" such that the first *Tunkl* factor would apply to the waiver. *See Tunkl*, 383 P.2d at 445 n.9 (stating that the public regulation factor applies where a contract modifies "the responsibilities normally attaching to a relationship which has been regarded in other connections as a fit subject for special regulatory treatment"); *see Lynch v. Santa Fe Nat'l Bank*, 627 P.2d 1247, 1252 (N.M. 1981) (distinguishing a bank's performance of "banking function[s]" which are subject to "extensive statutory regulations" and which are "an important and necessary public service" from an escrow service provided by a bank, a service that was not subject to extensive regulations, to conclude that the latter does not satisfy the first *Tunkl* factor).

The second and fourth *Tunkl* factors are interrelated. These factors pertain to circumstances in which a release pertaining to a service of "great importance" or "practical necessity"[4] gives the releasor a "decisive advantage of bargaining strength" over the releasee. *Berlangieri*, 76 P.3d at 1109. In New Mexico, and elsewhere, these factors have been held not to apply to recreational releases. *See id.* at 1113 (reasoning that "recreational horseback riding has not been shown to be a service of 'practical necessity' such as a utility service" such that the second *Tunkl* factor would apply; and observing that the second *Tunkl* factor relates to the "superior bargaining power" that  is "more likely to exist when the service is of practical necessity to the public"); *Jones v. Dressel*, 623 P.2d 370, 372, 377-78 (Colo. 1981) (linking the second and fourth *Tunkl* factors in an analysis of a recreational release pertaining to skydiving, and concluding that because the defendant was not providing an "essential service," the plaintiff was not subjected to the defendant's "decisive advantage of bargaining" in waiving his right to sue and exempting the

---

[4] *See Tunkl*, 383 P.2d at 445 n.10 (indicating that places of public accommodation such as retail stores, restaurants, and businesses who have a duty to serve all comers "in the manner of innkeepers and common carriers of old" are providing services of public necessity).

defendant from liability); *see Dalury v. S-K-I, Ltd*, 670 A.2d 795, 799 (Vt. 1995) ("Whether or not defendants provide an essential public service does not resolve the public policy question in the recreational sports context.").

## 2. *Tunkl* Factors 3, 5, and 6

### a. The Third *Tunkl* Factor

The third *Tunkl* factor weighs against enforcing a release where the defendant holds itself "out as willing to perform [the at-issue] service for any member of the public who seeks it, or at least for any member coming within certain established standards[.]" *Berlangieri*, 76 P. 3d at 1109. This factor was designed to recognize a distinction between sellers who have a "duty to serve" all members of the public who seek their services (and who are generally prohibited from enforcing liability waivers), from sellers whose specialized services are limited to persons and entities within that specialization. *See Tunkl*, 383 P.2d at 445 n.12; *Appalachian Ins. Co. v. McDonnell Douglas Corp.*, 262 Cal. Rptr. 716, 719, 733 (Cal. Ct. App. 4th 1989) (rejecting an argument that the third *Tunkl* factor applied in favor of an exculpatory clause in a contract for the sale of a product (a rocket) that had never been sold to a member of the general public, and had only been sold to large, sophisticated commercial and governmental entities); *Am. Structural Composites, Inc. v. Int'l Conference of Bldg. Officials*, 325 F. Supp. 2d 1148, 1151 (D. Nev. 2004) (recognizing that the third *Tunkl* factor does not apply to liability waivers in favor of companies whose services are not available to the general public, and are used only by select private companies or specialized commercial entities); *see also Levin v. Airgas Sw., Inc.*, No. Civ. 05-629 JB/WDS, 2006 WL 1305040, at *16 (D. N.M. 2006) (unpublished) (concluding that the third *Tunkl* factor favored upholding a liability release pertaining to a company whose

product (liquid nitrogen) was available for sale only to licensed medical doctors, ambulance companies, and persons with valid prescriptions, but not to the general public).

Defendant argues that the third *Tunkl* factor weighs in favor of enforcing the release because the Academy is not open to the general public and permission to engage in the climbing activities is granted pursuant to an "internal Risk Management Process[,]" subject to the approval of the "Air Force 351 BATS commander." (Doc. 21 at 10; Doc. 21-1 ¶ 8.) Defendant argues further that, "even after approval, a participant is not permitted to rappel without participating in training and demonstrating, while still anchored to the tower, that he or she knows how to use the rappelling device." (Id.) The Court concludes on the information presented, that the third *Tunkl* factor neither weighs in favor of, nor against enforcing the waiver in this case.

Defendant's mere allusion to an internal risk management process, a process that was undertaken without Plaintiff's knowledge or involvement, is unavailing. As demonstrated by the fact of her participation in the climbing activity, Plaintiff satisfied the "established standards" (whatever they may be) pursuant to which non-military members are offered the opportunity to engage in climbing activities at the Academy. Furthermore, the facts presently before the Court do not support the notion that the activity was offered only to a select group of specialized or specially licensed individuals. To that end, the Court notes that Plaintiff was a novice climber and, insofar as the Court is aware, neither she nor any of her coworkers were members of the armed forces. Although they were granted access to the Academy, there is no evidence that the same access would not have been granted to any member of the general public who satisfied unknown standards applied to Plaintiff and her coworkers as part of Defendant's internal risk management process. Indeed, Sergeant Stidham's affidavit suggests that the tower is open for

"group" use subject only to the risk management process and the commander's approval.  (Doc. 21-1 ¶ 8.)

That Plaintiff and her coworkers were offered some contemporaneous, on-site "training" and were required to demonstrate that they knew how to use the rappelling equipment before participating in the climbing does not alter the Court's analysis.  *See Berlangieri*, 76 P.3d at 1112 (holding that the third *Tunkl* factor weighed in favor of invalidating the release because the lodge was "open to the public" and it did "not require its patrons to meet criteria such as being experienced horseback riders before they may purchase[its] services"); *cf. Hanks*, 885 A.2d at 744 (reasoning that the fact that the defendant offered its snowtubing services to the public generally subject to the "minimal restriction that only persons at least six years old or forty-four inches tall are eligible to participate" weighed in favor of invalidating a recreational release).

On the other hand, the Court notes that the Academy is located on a military base to which access generally is restricted, except under certain circumstances, from the general public. Furthermore, nothing in the record suggests that the Academy holds itself out publically as a provider of recreational services—climbing or otherwise.  In these respects, the Academy is not reasonably comparable to entities, such as the resort in *Berlangieri*, that are in the business of providing recreational opportunities to paying guests.  These considerations lead the Court to conclude that applying the third *Tunkl* factor under the circumstances of this case is tenuous, at best.  As such, this factor weighs neutrally in the Court's public policy analysis.

**The Fifth *Tunkl* Factor**

The fifth *Tunkl* factor weighs in favor of invalidating a recreational release where the service provider exercises superior bargaining power and does not provide the participant with the opportunity to pay additional reasonable fees to obtain protection against negligence.

*Berlangieri*, 76 P. 3d at 1109. The Court notes that in *Berlangieri*, the New Mexico Supreme Court did not clearly distinguish the concept of a "decisive advantage of bargaining strength" (an element of the fourth *Tunkl* factor) from the concept of "superior bargaining power" (an element of the fifth *Tunkl* factor). Thus, as noted earlier in this Opinion, the *Berlangieri* court reasoned that "superior bargaining power is more likely to exist when a service is of practical necessity to the public" and, because recreational horseback riding is not a service of "practical necessity," the defendant in that case was held not to have possessed superior bargaining power. *Id.* at 1113.

Relying on *Berlangieri* for the proposition that recreational activities are not matters of practical necessity, Defendant argues that the fifth *Tunkl* factor "clearly weigh[s] in favor of enforcing the release." (Doc. 21 at 9.) The Court is not so persuaded. Considering the *Berlangieri* Court's association of "superior bargaining power" with the concept of a service of "practical necessity" the Court infers that the *Berlangieri* court's discussion of the "superior bargaining power" of a releasee applied to the fourth, not to the fifth, *Tunkl* factor.[5] This inference is supported, not only by the context of the *Berlangieri* court's discussion, but also by the fact that, among that court's stated reasons for invalidating the release was the fact that the plaintiff was not offered the opportunity to purchase additional protection for negligence. *See id.* 1112 (noting the fact that "Running Elk . . . did not offer a way for Berlangieri to expand his protection by purchasing additional coverage for injuries caused by Running Elk employees" in support of the holding that most of the *Tunkl* factors weighed in favor of invalidating the release). Insofar as the latter consideration is integral to the fifth *Tunkl* factor, *Berlangieri* does not support the notion that the fifth *Tunkl* factor weighs in favor of enforcing the waiver.

---

[5] As discussed earlier, the fourth *Tunkl* factor applies where the releasee possesses a "decisive advantage of bargaining strength" based on its provision of an "essential" service such as a utility or other service of practical necessity.

Even assuming that *Berlangieri* should be construed as holding that the aspect of the fifth *Tunkl* factor pertaining to the relative bargaining strength of the parties did not apply in the context of the recreational release at issue in that case, the Court does not construe that holding to imply that superior bargaining power could *never* exist in the context of a recreational release. In support of its reasoning in regard to superior bargaining power, the *Berlangieri* court relied on *Milligan v. Big Valley Corporation*, in which the Supreme Court of Wyoming considered the enforceability of a recreational release pertaining to an ironman decathalon. *Milligan*, 754 P.2d 1063, 1064-67 (Wyo. 1988); *Berlangieri*, 76 P.3d at 1113. The *Milligan* court concluded that the appellant's husband, "an experienced expert skier and a certified ski instructor at the Jackson Hole ski area," who died as a result of his participation in the downhill skiing portion of the decathlon, was not subject to a "severe disparity of bargaining power" when he signed the release. *Id.* at 1066-67. Among other considerations, the *Milligan* court's conclusion in this regard was supported by the absence of evidence that the decedent was unfairly pressured into signing the release or that he was deprived of an opportunity to understand its implications.[6] *Id.* at 1067. Thus *Milligan* implied, if not held, that the subjective perceptions of a participant who is presented with a recreational release may be considered in context of relative bargaining power factor. While the *Milligan* court merely raised this consideration, other courts have brought it to the fore.

After *Berlangieri* was decided, the Supreme Court of Connecticut decided *Hanks*, which, as noted earlier centered upon the enforceability of a release pertaining to recreational snowtubing.

---

[6] The *Milligan* court's reasoning in this regard also included the observation that skiing in the race was not a matter of practical necessity for the public because the race was not an essential service—like a public utility, common carrier, hospital or employer. 754 P.2d at 1066-67. The *Berlangieri* court, which focused on the "practical necessity" aspect of the *Milligan* court's reasoning, did not address the Milligan court's discussion of the decedent's subjective experience—*i.e.*, whether he was "pressured" or whether he understood the implications of signing the release. *Berlangieri*, 76 P.3d 1098 at 1113.

*Hanks*, 885 A.2d at 739-40. The *Hanks* court directly addressed—and ultimately rejected the notion that there can never be a disparity of bargaining power in the context of voluntary or elective services. *Hanks*, 885 A.2d at 746. The plaintiff in *Hanks* had travelled to the recreational facility in anticipation of snowtubing. *Id.* Upon arrival, he was faced with the dilemma of either signing the defendant's proffered liability waiver—which was presented on a take-it-or-leave it basis with no opportunity to purchase additional protection against negligence, or foregoing the opportunity to engage in the activity. *Id.* While the *Hanks* court acknowledged that snowtubing is a voluntary activity as opposed to a service of public necessity, the court also reasoned that under the aforementioned circumstances, "it would ignore reality to conclude that the plaintiff wielded the same bargaining power as the defendants." *Id.* Thus, the *Hanks* court recognized that even in the context of non-essential services, a service provider who presents a prospective participant with the limited options of signing a non-negotiable release or being excluded from the recreational opportunity enjoys a superior bargaining position.

Later, in considering the enforceability of a recreational release pertaining to horseback riding, the Supreme Court of Connecticut adhered to, and expanded upon this reasoning. *See Reardon v. Windswept Farm, LLC*, 905 A.2d 1156, 1158-60, 1162 (Conn. 2006). In *Reardon*, the Connecticut Supreme Court declined to enforce a recreational release on the ground, among others, that like the snowtubing patron in *Hanks*, the plaintiff, who sought to participate in recreational horseback riding "had nearly zero bargaining power with respect to the negotiation of [a liability] release." *Reardon*, 905 A.2d 1162. The court explained that the release was presented on a take it or leave it basis to the plaintiff—a patron who "lacked the knowledge, experience, and authority to discern whether, much less ensure that, the defendants' facilities or equipment were maintained in a reasonably safe condition." *Id.* at 1161 (citing *Hanks*, 885 A.2d

at 734 (alterations omitted)). Thus, in order to participate in the activity, the plaintiff was required to assume the risk of the defendant's negligence—including negligent conduct that she was not in a position to foresee or control. *Id.* at 1161-62. The court concluded that it was "illogical to relieve the defendants, as the parties with the greater expertise and information concerning the dangers associated with . . . horseback riding at their facility, from potential claims of negligence surrounding an alleged failure to administer [the activity] properly[.]" *Id.* at 1162.

Returning to the facts of this case, and incorporating the reasoning of *Milligan*, *Hanks*, and *Reardon*, the Court concludes that the issue of superior bargaining power is appropriately informed by these practical and subjective considerations. Plaintiff was present at the Academy because she had chosen to participate in team building activities with her coworkers. She did not expect the day's activities to include climbing. Once she was at the Academy, surrounded by her coworkers, Plaintiff was presented with the option of signing the waiver or altogether foregoing participation in the team building activity. As a novice climber, Plaintiff lacked the experience and knowledge to discern whether the instruction that she received or the equipment with which she was provided comported with basic safety standards. And, as discussed earlier in this opinion, neither the waiver, nor the instructor, alerted her to specific dangers associated with the climbing activity. Under these circumstances, the Court cannot reasonably conclude that Plaintiff and Defendant possessed equal bargaining power.[7] This, combined with the fact that

---

[7] Considering that the *Berlangieri* court neither addressed the broader considerations outlined in *Hanks* and *Reardon* nor expressly rejected the notion that superior bargaining power may be found in the context of a recreational release, the Court's conclusion does not contravene New Mexico law. To the contrary, these circumstances are broadly analogous circumstances in which the New Mexico Supreme Court recently recognized the existence of superior bargaining power in the context of a procedural unconscionability analysis. *See e.g. State ex rel. King v. B&B Inv. Group, Inc.,* 329 P.3d 658, 662, 665, 668-69 (N.M. 2014) (holding that payday lenders possessed superior bargaining strength over loan consumers who were financially unsophisticated and "lacked knowledge, ability, experience or capacity in credit consumption" and who presented borrowers with the choice of either accepting the non-negotiable terms of the contract or walking away from the loan). The Court does not

Plaintiff was not given the opportunity to purchase additional protection against negligence, leads the Court to conclude that the fifth *Tunkl* factor weighs against enforcing the waiver. *See Berlangieri*, 76 P.3d at 1112 (indicating that in the absence of an option to purchase additional coverage to protect against negligence weighs against enforcing a recreational release).

### b. **The Sixth *Tunkl* Factor**

The sixth *Tunkl* factor weighs in favor of invalidating a release where, as a result of the transaction, "the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or [its] agents." *Berlangieri*, 76 P.3d at 1109-10. The *Berlangieri* court held that the sixth *Tunkl* factor weighed against enforcing the recreational release at issue in that case. *Berlangieri*, 76 P.3d at 1113. In support of its holding, the court reasoned that plaintiff, who was a novice horseback rider, "could not independently verify that his saddle was mounted properly." *Id.* As such, the court held, he was clearly subject to the risk of carelessness by the defendant's] employees. *Id.* at 1112-13.

Defendant does not address this aspect of *Berlangieri*'s holding. (See Doc. 21 at 10-11; Doc. 44 at 5; Doc. 49.) Instead, Defendant cites *Lynch*, in which the New Mexico Court of Appeals recognized the general proposition that "[e]xculpatory clauses in contracts . . . are not favorites of the law" and they "will not be enforced if the promisee enjoys a bargaining power superior to the promisor, as where the promisor is required to deal with the promisee on his own terms."

---

believe, nor does it intend to imply that the circumstances under which the waiver was signed is comparable to the circumstances described in *King* in which impoverished, uneducated, and unbanked or underbanked citizens of New Mexico were led to accept grossly unfair interest rates on payday loans. Nor does the Court conclude that the waiver constituted a contract of adhesion. *See Fiser v. Dell Comput. Corp.*, 188 P.3d 1215, 1217-18, 1221 (N.M. 2008) (suggesting, but not deciding, that the terms and conditions to which a consumer was assumed to have assented by purchasing a computer from a company's website did not constitute a contract of adhesion because there was no evidence that the plaintiff "could not avoid doing business under the particular terms mandated by [the] [d]efendant"). However, considering Plaintiff's inexperience and lack of knowledge of climbing procedures and equipment, and considering that Plaintiff was faced with the choice of signing the waiver or declining to participate in a team building activity while surrounded by coworkers, it would, as stated in *Hanks*, "ignore reality" to conclude that Plaintiff and Defendant possessed equal bargaining strength. *Hanks*, 885 A.2d at 746.

(Doc. 21 at 10-11.) *Lynch*, 627 P.2d at 1249. Although *Lynch* did involve a recreational release, and the *Lynch* court did not address the sixth *Tunkl* factor, Defendant relies on the foregoing proposition in support of its argument that "courts will invalidate an agreement if the party waiving his or her rights has no other option but to deal with the other party 'on his own terms.'" (Doc. 21 at 10.) While *Lynch* does not support the proposition for which it is cited by Defendant, *Berlangieri* clearly supports a conclusion that the sixth *Tunkl* factor weighs against enforcing the waiver. Just as the plaintiff in *Berlangieri* was, by virtue of lack of horseback riding experience and unfamiliarity with the riding equipment, "subject to the risk of carelessness" by the defendant's employees, Plaintiff's status as a novice climber, unfamiliar with the requisite equipment, subjected her to the risk of Defendant's carelessness. Accordingly, the sixth *Tunkl* factor weighs against enforcing the waiver.

Having concluded that at least two *Tunkl* factors weigh against enforcing the overly broad waiver, the Court concludes that enforcing the waiver under the circumstances of this case would also be unjust as a matter of public policy. *Berlangieri*, 76 P.3d at 1109-10 (indicating that the *Tunkl* factors are a guide to determine whether public policy should operate to void a recreational release and to resolve the question of whether its enforcement would be unjust).

**V.      The Waiver Does Not Deprive This Court of Subject Matter Jurisdiction**

Because the Court has determined that the waiver signed by Plaintiff as a prerequisite to her participation the climbing activity at the Academy does not stand as a valid and enforceable bar against her negligence claims, Defendant's argument that the waiver effectively precludes this Court's subject matter jurisdiction under 28 U.S.C. Section 1346(b)(1) necessarily fails.

**VI.      Conclusion**

For the reasons stated herein, Defendant's *Motion to Dismiss Second Amended Complaint (ECF No. 17) For Lack of Subject-Matter Jurisdiction and Memorandum in Support* (Doc. 21), is **DENIED**.

**IT IS SO ORDERED.**

_____
**KIRTAN KHALSA**
**United States Magistrate Judge**